**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 12-cv-2388-WJM

CURE LAND, LLC, and
CURE LAND II, LLC,

      Plaintiffs,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE,
TOM VILSACK, in his official capacity as Secretary of the United States Department of
Agriculture,
FARM SERVICE AGENCY, an Agency of the United States Department of Agriculture,
and
JUAN M. GARCIA, in his official capacity as Administrator of the Farm Service Agency,

      Defendants.

---

**ORDER AFFIRMING AGENCY'S DECISION**

---

      Plaintiffs Cure Land, LLC and Cure Land II, LLC (jointly the "Plaintiffs") bring this

action against Defendants the United States Department of Agriculture ("USDA"), the

Farm Service Agency ("FSA") (jointly the "Agency"), Tom Vilsack in his official capacity

as Secretary of the USDA, and Juan M. Garcia in his official capacity as Administrator

of the FSA (collectively the "Defendants").  (ECF No. 1.)  This matter is before the Court

pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, on

Plaintiffs' appeal of the Agency's decision to exclude certain lands from a proposed

water conservation program.  (*Id.*)  For the reasons set forth below, the Agency's

decision is affirmed.

## I.  BACKGROUND

**A.    Statutory Background**

The National Environmental Policy Act ("NEPA") is "[t]he centerpiece of environmental regulation in the United States".  *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2009).  NEPA's "twin aims" require a federal agency "to consider every significant aspect of the environmental impact of a proposed action," and to "inform the public that it has indeed considered environmental concerns in its decision-making process."  *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council*, 462 U.S. 87, 97 (1983).  "The Act does not require agencies to elevate environmental concerns over other appropriate considerations, however; it requires only that the agency take a 'hard look' at the environmental consequences before taking a major action."  *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1207-08 (10th Cir. 2002) (citing *Baltimore Gas*, 462 U.S. at 97).  That is, NEPA "'merely prohibits uninformed—rather than unwise—agency action.'" *Richardson*, 565 F.3d at 704 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989)).

"Before an agency may take 'major Federal actions significantly affecting the quality of the human environment,' an agency must prepare an environmental impact statement ("EIS") in which the agency considers the environmental impacts of the proposed action and evaluate[s] 'alternatives to the proposed action,' including the option of taking 'no action.'"  *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006) (quoting 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14(d)).

However, "[i]f an agency is uncertain whether the proposed action will significantly affect the environment, it may prepare a considerably less detailed environmental assessment" ("EA") to determine whether an EIS is necessary.  *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006) (citing 40 C.F.R. § 1508.9).  If the EA concludes that the proposed project will have a significant effect on the environment, the agency must then develop an EIS; if not, the agency then issues a "Finding of No Significant Impact" ("FONSI"), and no further agency action is required.  *Id.*

In addition to these procedural requirements, "[a]t all stages throughout the process, the public must be informed and its comments considered."  *Richardson*, 565 F.3d at 704 (citing 40 C.F.R. §§ 1503.1, 1505.2, 1506.10).  NEPA does not circumscribe "the substantive action an agency may take—the Act simply imposes procedural requirements intended to improve environmental impact information available to agencies and the public."  *Id.*

## B.    Factual and Procedural Background

This action arises out of a proposed amendment to the Colorado Republican River Conservation Reserve Enhancement Program ("RR CREP").  The RR CREP is a federal-state program in which enrolled cropland owners receive federal funding in exchange for agreeing to cease irrigation of their lands, with the aim of conserving water, improving water quality, controlling erosion, and protecting wildlife.  (Amended Admin. Record ("R.") (ECF No. 29) at CL01600-15.)  The RR CREP Agreement involves the USDA and the State of Colorado, among other parties, and is administered by the FSA, an agency of the USDA.  (*Id.* at CL01352-64.)  The RR CREP Agreement

was entered into in April 2006.  (*Id.*)

In June 2007, an amendment was proposed to the RR CREP Agreement ("Amendment"), which included the addition of an area of land known as the "Target Zone" within which Colorado's Republican River Water Conservation District (the "District") could purchase the water rights.  (R. at CL01184-85.)  The District intended to use the RR CREP funds to further incentivize landowners in the Target Zone to agree to divert water to a pipeline that would feed into the Republican River, thereby helping the State of Colorado meet its water supply obligations under a compact with Kansas and Nebraska.  (*Id.*)  In 2008, pursuant to this plan, the District purchased some of the water rights to lands owned by Plaintiffs in the Target Zone.  (*Id.* at CL01114-15.)  In the course of considering the Amendment, the Agency expressed concerns regarding the inclusion of the Target Zone in the RR CREP.  Specifically, the Agency considered whether a Target Zone landowner could be a voluntary participant in the CREP if compliance with the compact was mandatory, and whether diverting water to the pipeline would have conservation benefits, given that the water could later be used by other states rather than conserved.  (*See id.* at CL00615-18, 621-22.)

In October 2009, the Agency informed Colorado that it generally supported the Amendment and intended to prepare a supplemental environmental assessment to evaluate the Amendment's environmental impact ("Supplemental EA").  (R. at CL00699.)  During the course of these preparations, the Agency began to receive public comments regarding the Amendment, some of which challenged the inclusion of the Target Zone.  (*See, e.g.*, *id.* at CL01750.)  This opposition initially came from one individual who argued that the Target Zone lands were principally owned by one family,

which would stand to profit inequitably from selling their water rights to the District for compact compliance, while also receiving RR CREP funds.  (*See id.*)  However, the Agency then began receiving similar comments from other individuals, indicating a broader controversy and prompting the Agency to hold a public meeting in October 2010 to solicit verbal comments on the Supplemental EA.  (*Id.* at CL00806, 1690.)  The Agency received several verbal comments at the public meeting, and subsequently received several written comments from individuals, letters from other conservation districts rescinding previous support for the Amendment, and a petition with 90 signatures, most of which challenged the inclusion of the Target Zone in the Amendment.  (*Id.* at CL00771, 800.)

        In December 2010, the Agency published the Final Supplemental EA (R. at CL00379-464), which concluded that the Amendment as a whole would have environmental benefits and would have "no expected long term significant negative impacts . . . ."  (*Id.* at 00427.)  The Supplemental EA reviewed the comments received in opposition to the inclusion of the Target Zone, and generally noted that no change to the EA was required.  (*Id.* at CL00444, 449-460.)  In a few instances, the Supplemental EA declined to respond to the commenters' concerns regarding the fairness of the incentive payments and the equity of including the Target Zone in the Amendment, because such issue was deemed "not an issue for the EA".  (*Id.* at CL00452, 53.)

        In December 2010, the Agency prepared a draft decision document concluding that no significant environmental impact would occur ("Draft FONSI") if the Amendment were implemented as originally proposed.  (R. at CL01867.)  However, the Draft FONSI

was not finalized due to concerns regarding the public controversy, amongst other factors. (*See id.* at CL01525-30.) On April 16, 2012, the Agency issued a FONSI that removed the Target Zone from the proposed Amendment. (*Id.* at CL00375-76.)

On September 7, 2012, Plaintiffs filed this action challenging the Agency's decision to exclude the Target Zone from the Amendment. (ECF No. 1.) Plaintiffs' Opening Brief was filed on May 1, 2013. (ECF No. 30.) Defendants filed their Response Brief on May 31, 2013 (ECF No. 31), and fourteen days later, Plaintiffs filed their Reply (ECF No. 32).

## II. LEGAL STANDARD

The role of a court reviewing a NEPA challenge "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Baltimore Gas*, 462 U.S. at 97-98; *see also Richardson*, 565 F.3d at 704 ("As with other challenges arising under the APA, we review an agency's NEPA compliance to see whether it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (quoting 5 U.S.C. § 706(2)(A)).

An agency's decision is considered arbitrary and capricious if it "(1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment." *Richardson*, 565 F.3d at 704 (quotations omitted). The Court's

"inquiry under the APA must be thorough, but the standard of review is very deferential to the agency. . . .  A presumption of validity attaches to the agency action and the burden of proof rests with [the party raising the challenge]."  *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013) (internal citations omitted).

### III.  ANALYSIS

Plaintiffs argue that the Agency's decision to exclude the Target Zone from the Amendment was arbitrary and capricious, an abuse of discretion, and not in accordance with law, and should therefore be vacated.  (ECF No. 30 at 19.)  Plaintiffs readily admit that this is not the ordinary posture of a NEPA challenge, which typically argues that an agency should have performed more environmental analysis.  (*Id.* at 1.)  Instead, Plaintiffs' challenge is rooted in NEPA's procedural requirements, contesting the Agency's change of position between the Supplemental EA and the FONSI.  Plaintiffs raise three arguments: (1) the Agency improperly changed course to exclude the Target Zone despite its prior analyses; (2) Defendants improperly disregarded their own technical analyses and bowed to political pressures; and (3) Defendants had no authority to exclude the Target Zone as a mitigation measure.  (*Id.* at 19-30.)  The Court will discuss each argument in turn.

### A.    Change of Course

Plaintiffs argue that the Agency's decision to exclude the Target Zone was arbitrary and capricious because it was an unjustified change of course from the Agency's findings in the Supplemental EA that no adverse environmental

7

consequences would result. (ECF No. 30 at 19-23.) Plaintiffs contend that the decision was made with no public explanation, constituting arbitrary and capricious action and an abuse of discretion. (*Id.* at 20.)

Plaintiffs cite numerous authorities holding that an agency may not abandon a previous policy or rule without providing a reasoned explanation for its reversal. (*Id.* at 20-22.) The factual scenarios in the cases cited by Plaintiffs include an agency decision to abandon a rule requiring airbags in new vehicles, *see Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29 (1983); an agency's issuance of an operating permit without a compliance schedule in violation of prior policies and practices, *see New York Public Interest Research Group, Inc. v. Johnson*, 427 F.3d 172 (2d Cir. 2005); an agency's change of position regarding whether a bridge would adversely affect the area's scenic and recreational values, *see Sierra Club North Star Chapter v. LaHood*, 693 F. Supp. 2d 958 (D. Minn. 2010); and an agency's change of position regarding the necessity of firearm restrictions to ensure public safety in national parks and wildlife refuges, *see Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1 (D.D.C. 2010). (ECF No. 30 at 20-22.)

While Plaintiffs' argument is somewhat compelling, ultimately the Court is not persuaded. As an initial matter, the majority of the authorities Plaintiffs cite involve established policies or promulgated rules that are subsequently abandoned without explanation. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 29. The instant case is distinguishable, as it does not involve a policy or rule that was previously established and subsequently abandoned. Rather, it involves a proposed amendment to expand

the scope of a conservation program, and a change in the size of the proposed expansion between the environmental evaluation (the Supplemental EA) and the final decision (the FONSI).  A case involving "the revocation of an extant regulation", wherein "[r]evocation constitutes a reversal of the agency's former views as to the proper course", does not inform the instant case, where the initial proposal was not formally promulgated.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 41 (noting that a "settled course of behavior" in carrying out the agency's policies implies "a presumption that those policies will be carried out best if the settled rule is adhered to").  The proposed Amendment discussed in the Supplemental EA was neither a promulgated rule, nor an established practice constituting a "settled course of behavior".  *Id.*  Accordingly, the Court finds these cases inapplicable here.

Rather than requiring an explanation for the change in course, NEPA requires only that the Agency "articulate 'a rational connection between the facts found and the choice made.'"  *Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1096 (10th Cir. 2004) (quoting *Baltimore Gas*, 462 U.S. at 105).  In *Friends of Marolt Park*, the agency changed the scope of the proposal—the "preferred option"—between the environmental evaluation document (a draft supplemental EIS) and the decision document (a Record of Decision), wherein it explained that it modified the preferred option based on a lack of public support and due to additional costs.  *Id.* at 1092, 1096. The Supreme Court held that the explanation in the decision document provided the requisite rational connection between the facts and the decision, and the agency appropriately evaluated the environmental impact of its decision.  *Id.* at 1096.  *Friends*

*of Marolt Park* thus supports Defendants' argument that an agency conducting an environmental review under NEPA has not established a policy merely by evaluating one proposed action in its environmental document, nor is it required to tie any change in that proposed action to its environmental impact, as long as it articulates the required rational connection for the change.  *Id.*

The Court finds that the FONSI sufficiently articulated such a connection here. Under the title "Reasons for Finding of No Significant Impact", the Agency explains that "the Target Zone has been removed from the preferred alternative and a [FONSI] is being rendered.  This determination is based on the following" ten enumerated reasons. (R. at CL00376.)  Most of the listed reasons relate to the environmental impact of the proposed Amendment, but one describes public opinion, as follows:

> The potential impacts on the quality of the human environment are not considered highly controversial. Additional public involvement measures were taken for this action given the high public interest in the action. Comments received throughout the project did not indicate significant concern with the environmental analysis but rather opposition to the proposed incentive payments and eligibility requirements described in the proposed Amendment to the Republican River CREP.

(*Id.* at CL00376 ¶ 4.)  The FONSI does not explicitly state that the comments received were specifically opposed to the inclusion of the Target Zone.  However, the ten enumerated reasons are offered in explanation of the decision to remove the Target Zone and issue a FONSI.  Thus, the cited language articulates a rational connection between the decision to remove the challenged area and the comments received, which satisfies the Agency's obligations.  *See Friends of Marolt Park*, 382 F.3d at 1096.

Plaintiffs object to the application of the legal standard articulated in *Friends of Marolt Park*, and the majority of the argument in Plaintiffs' Reply is spent in distinguishing that case.  (ECF No. 32 at 8-12.)  First, Plaintiffs argue that the agency in *Friends of Marolt Park* had issued a draft EIS that identified both the initial proposal and the alternative that was ultimately selected, which gave the public notice and an opportunity to comment on them.  (*Id.* at 9.)  Here, Plaintiffs note that the Supplemental EA did not discuss an alternative that omitted the Target Zone, and thus contend that the public was not provided notice or an opportunity to comment on the potential exclusion of the Target Zone.  (*Id.*)  However, Plaintiffs' argument fails because the Record shows that the public was given ample opportunity to comment on any and all aspects of the proposed Amendment.  Indeed, as the FONSI notes, "[a]dditional public involvement measures were taken," including holding a public meeting to receive verbal as well as written comments.  (*See* R. at CL00376, CL00806-56.)  Plaintiffs have cited no support for their contention that an agency may not choose to implement a portion of a proposed action unless it has specifically identified that portion as a separate alternative before soliciting comments.  As a practical matter, such a requirement would be unduly burdensome for agencies, which regularly propose complex actions with many parts.  Thus, the Court finds that an opportunity for public comment was properly provided in this case.

Plaintiffs next argue that, unlike *Friends of Marolt Park*, the Agency here "only considered half the story" because it failed to seek comment from Plaintiffs, who would have provided explanations to alleviate the inequity concerns raised by other members

of the public.  (ECF No. 32 at 10.)  However, Plaintiffs have cited no authority requiring an agency to request comment from specific members of the public who will be affected by a decision.  Plaintiffs had an opportunity to comment along with all other members of the public, but provided no such comment to the Agency for its consideration.  (*See* R. at CL00806-56.)  Accordingly, the Court finds no indication that the Agency's consideration of public opinion was biased or that the Agency failed to consider all relevant factors because it did not seek comment from Plaintiffs.

Finally, Plaintiffs argue that *Friends of Marolt Park* is distinguishable because in that case, the proposed action required voter approval, and thus public opinion was a necessary component of the action.  (ECF No. 32 at 10-11.)  Since voter approval was not required to implement the Amendment here, Plaintiffs argue that the Agency's decisionmaking was flawed because there was no indication that public opinion would be a factor in its decision.  (*Id.* at 11-12.)  This argument ignores the fact that informing the public and considering its opinion is a core obligation of an agency in compliance with NEPA.  *See Richardson*, 565 F.3d at 704; *see also* 40 C.F.R. §§ 1503.1, 1505.2, 1506.10.  Plaintiffs appear to presume that NEPA requires an agency to consider only, or principally, environmental factors in its decisionmaking, when the case law states otherwise.  *See, e.g.*, *Utah Shared Access Alliance*, 288 F.3d at 1207 ("[NEPA] does not require agencies to elevate environmental concerns over other appropriate considerations"); *cf. Friends of Marolt Park*, 382 F.3d at 1092 (modifying a proposed action based on public opinion and cost considerations).

12

Accordingly, the Court finds that *Friends of Marolt Park* is applicable here. Pursuant to the legal standard articulated by the Tenth Circuit therein, the Court finds that the Agency sufficiently articulated its reasons for modifying the proposed action and excluding the Target Zone, and that it appropriately considered public opinion in doing so.

## B.   Political Pressures

Plaintiffs contend that the Agency's decision to exclude the Target Zone was arbitrary and capricious because that decision was based on political pressure instead of the Agency's environmental evaluation.  (ECF No. 30 at 26-29.)  Plaintiffs argue that an agency may not rely on "factors which Congress has not intended it to consider", including the desire to avoid "political heat".  (*Id.* (citing *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)*; D.C. Fed'n of Civil Ass'ns v. Volpe*, 459 F.2d 1231, 1248 (D.C. Cir. 1972); *Tummino v. Torti*, 603 F. Supp. 2d 519, 542 (E.D.N.Y. 2009)).)

Plaintiffs' cited authorities note that an agency's decision must not result from political bias, *see Latecoere*, 19 F.3d at 1364; must not involve factors that would invalidate the statutory requirements, *see D.C. Federation*, 459 F.2d at 1248; and must not be made in bad faith in departure from the agency's own policies, *see Tummino*, 603 F. Supp. 2d at 547.  Here, in contrast, the Agency's consideration of public comments and controversy was not in violation of a statutory requirement to only consider other factors.  NEPA explicitly permits and requires an agency to provide public notice and an opportunity to comment.  *See Richardson*, 565 F.3d at 704; *see also* 40 C.F.R. §§

1503.1, 1505.2, 1506.10.  Because the Agency here was permitted to consider public

opinion, and there is no indication that it abandoned its own policies or invalidated the

statutory scheme in doing so, the Court finds no evidence of bad faith or bias.

Plaintiffs have characterized the tenor of the public comments here as "political

pressure" in order to analogize the instant case to those in which an agency caved to

pressure from corporate interests or other branches of government.  (*See*  ECF No. 30

at 26-29.)  However, if the Court were to accept Plaintiffs' exceedingly broad definition

of "political pressure", that definition would swallow the entire public comment process,

in which the weight of local politics can always be discerned.  The Court declines to

create conflict with the express language of NEPA to make such a sweeping ruling

here, and rejects Plaintiffs' political pressure argument.

**C.**    **Mitigation Measure**

Finally, Plaintiffs argue that the exclusion of the Target Zone in the context of a

FONSI suggests that Defendants intended it as a mitigation measure that would avoid

any significant environmental impact.  (ECF No. 30 at 24.)  Because a mitigation

measure requires substantial evidence to support it and may only be used to mitigate

environmental impacts, not social or economic effects, Plaintiffs contend that exclusion

of the Target Zone was inappropriate as a mitigation measure here.  (*Id.* at 24-26.)

Defendants do not respond to this argument, instead focusing on defending the

Agency's decision in the context of the four factors that can constitute arbitrary and

capricious action.  (*See* ECF No. 31 at 15-26.)  However, the Court finds nothing in the

Record that would suggest that Defendants intended the exclusion of the Target Zone

to be a mitigation measure.  Rather, the Supplemental EA is clear that no significant impacts on the human environment would result from the proposed Amendment even if it included the Target Zone, which obviates the need to mitigate any environmental impacts, whether by excluding the Target Zone or otherwise.  (*See* R. at CL00427 (noting "no expected long term significant negative impacts associated with implementation of the Proposed Amendment"); CL00454 ("The findings of the EA did not result in significant impacts and no mitigation measures are required.").)  Therefore, the Court finds no need for the Agency's decision to meet the requirements for a mitigation measure, and rejects Plaintiffs' mitigation argument.

In sum, Plaintiffs have failed to show that the Agency's decision to exclude the Target Zone from the Amendment should be vacated, because they have not established that the Agency failed to consider an aspect of the problem, offered an explanation that was counter to the evidence, failed to base its decision on the relevant factors, or made a clear error of judgment.  *See Richardson*, 565 F.3d at 704. Therefore, the Court finds that the Agency's decision was not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, and it must be affirmed.  *See id.*

## IV.  CONCLUSION

For the foregoing reasons, the Court ORDERS that the Agency's decision to exclude the Target Zone from the Amendment is hereby AFFIRMED.  The Clerk shall enter judgment against Plaintiffs and in favor of Defendants.  Defendants shall have their costs.

Dated this 14th day of August, 2014.

BY THE COURT:

William J. Martinez
United States District Judge

16